565 A.2d 132

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Herbert WATSON, Appellant.**

Supreme Court of Pennsylvania.

Argued April 12, 1988.

Decided Oct. 19, 1989.

52

Marilyn J. Gelb, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh J. Burns, Jr., Asst. Dist. Atty., Robert A. Graci, Chief, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

McDERMOTT, Justice.*

Pursuant to 42 Pa.C.S. § 9711(h) we review the judgment of sentence of death imposed on Herbert Watson by the Court of Common Pleas of Philadelphia County. On November 10, 1983, a jury found Watson guilty of first degree murder, aggravated assault, and possession of an instrument of crime. Following a sentencing hearing, the jury determined that the Commonwealth established one aggravating circumstance, which outweighed the two mitigating circumstances offered by Watson. A sentence of death was imposed and the court sentenced appellant to consecutive terms of five to ten years imprisonment and two and one half to five years imprisonment respectively for the other crimes. In April of 1986, at the request of both parties, Watson's appeal to this Court was remanded for evidentiary hearings on all claims of ineffective assistance of counsel. The court rejected those claims and the matter was returned to this Court for argument and disposition.

* This case was reassigned to the writer.

The record established the following. On June 15, 1982, Herbert Watson went to the residence of Sheryl Harding. Both had lived together for approximately five years until they separated two weeks before the above date. Shortly before Watson arrived, Roslyne Johnson, Harding's sister, and Maxilyn Vann, Johnson's boyfriend, responding to Harding's telephone call, drove to the house to get Harding and her two children. While they waited outside in Vann's car, Watson approached and fired three shots into the car, two of which struck Vann. Johnson, seeing Watson approach, locked Harding's front door. Watson, however, shot the lock off and proceeded upstairs. There, he grabbed Harding from the closet where she was hiding with her two children, and shot her twice. After reloading his gun and leaving the room, he returned, shot Harding one more time, and then shot himself.

It is the policy of this Court to ascertain in all capital cases whether the evidence presented was sufficient to to support a finding of first degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). There can be no doubt that the evidence presented here, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to sustain a finding of first degree murder. That evidence showed that Watson purchased the weapon and ammunition two days before the shooting, that he stated his intention to kill Harding upon entering the house, and that he shot Harding twice in the chest and once in the leg, thereby causing her death. Although appellant now argues that counsel rendered ineffective assistance by failing to call witnesses whose testimony might have persuaded the jury that he lacked the capacity to form the specific intent to kill necessary for first degree murder, this argument for a new trial must be considered separately. The evidence would still suffice to support a finding of first degree murder regardless of the presence of any additional contrary evidence on the matter of intent. Watson's ineffectiveness claim, in this regard,

does not contest the sufficiency of the evidence, but argues that the jury ought to have heard other evidence that might have persuaded it to reach a different conclusion.

The "other evidence" that Watson argues his attorney should have investigated and presented to the jury consists of the results of psychological and psychiatric testing. About eight months after his arrest, at the request of his court-appointed attorney, Watson was examined by Dr. K. William Hylbert, a fourth-year resident in psychiatry at Temple University Medical School. Hylbert submitted a written report to counsel following a forty-five minute evaluation of Watson. At the end of the report, he wrote, "It does seem that Mr. Watson was psychotic after the incident, but I cannot be certain as to his mental status at the time of the shootings. I do believe that he had a diminished capacity to understand what he was doing. He is not psychotic now."

Watson's court-appointed attorney then requested and was granted funds for further testing, which was performed by Dr. Gerald Cooke, a clinical and forensic psychologist, in June of 1983. Cooke did not prepare a full report for counsel, having been advised that private representation had been retained on Watson's behalf. He did, however, provide a summary of his findings, which were as follows:

> His aggravated assault on the man in the car, Maxilyn Vann, was in my opinion, precipitated by delusions and hallucinations resulting in Mr. Watson perceiving that he was in danger and needed to shoot Mr. Vann, before Mr. Vann shot him. He believed Mr. Vann to be his common-law wife's boyfriend and actually perceived Mr. Vann's face as Bernard's. Thus, this shooting appears to meet the voluntary manslaughter criteria. However, his shooting of his girlfriend, Sheryl Harding, though committed while psychotic, agitated and depressed, was in my opinion, deliberate and intentional and I see no basis for insanity or diminished capacity in this shooting.

Cooke also contacted Watson's newly retained attorney, Lewis Small, to advise that he had conducted an evaluation.

The attorney, however, did not pursue substantive discussions with Cooke about his opinion of Watson's mental condition.

Dr. Kenneth Kool, a forensic psychiatrist, also examined Watson, on August 18, 1983, at Small's request. He made no final diagnosis or written report of his evaluation and was not called to testify at trial.

At the evidentiary hearing, trial counsel, Kenneth Mirsky, who had been assigned the case by Lewis Small, testified as to his reasons for not offering these witnesses. The doctors testified as to the opinions they would have offered if called.

According to Mirsky, he spoke with Hylbert prior to trial and determined that his testimony was not helpful, and indeed might lend support to the Commonwealth's case for proving premeditation. Although Mirsky was unable to recall specifically what Hylbert said that led him to this conclusion, Hylbert's testimony at the evidentiary hearing substantiates Mirsky's assessment. Hylbert testified that he found no evidence that at the time of the killing Watson was "unable to appreciate the difference between right and wrong or to appreciate the nature and consequences of his acts." He also stated his belief that Watson had "the cognitive abilities and premeditative plan to carry out his acts." The statement in his written report of his belief that Watson "had a diminished capacity to understand what he was doing," Hylbert explained, was not intended to be a reference to any legal concept of diminished capacity, but merely reflected his judgment as a psychiatrist that anyone who turns a gun on himself and shoots "is in need of some form of improved insight and judgment function."

We must agree with the conclusion of the trial judge, who also presided at the evidentiary hearing, that the appellant has utterly failed to meet his burden of proving that counsel was ineffective in not producing Hylbert as an expert at trial. Not only has he failed to overcome the presumption that counsel acted properly, the Commonwealth, by having

Hylbert testify at the hearing, produced evidence demonstrating the reasonableness of counsel's decision.

He next asserts that counsel was ineffective for failing to contact Cooke, after receiving the copy of the summary evaluation prepared for prior counsel. He argues that the results of this examination would have supported a claim that the killing was done "in the heat of passion," which in turn would have reduced the degree of homicide to voluntary manslaughter.

Although it is not precisely stated, analysis of this ineffectiveness claim must of necessity involve two components, because the evidence indicates that trial counsel, Mirsky, and his colleague, Small, each had different roles in the events. Mirsky testified that he did not recall being advised, either by Watson or by Small, that Watson had been evaluated by Cooke. Cooke's correspondence was with Small, and there is no indication that Mirsky was aware of the summary evaluation letter prior to trial. As to Mirsky, then, the claim of failure to investigate and to present available psychological testimony unravels for lack of evidence that Mirsky knew of its availability. However, because it was Small who was retained to represent Watson and who prepared the case, at least initially, Watson's assertion that his counsel was ineffective in not at least interviewing Cooke encompasses Small's course of action as well. In conducting this review we are not unmindful of the fact that present counsel attempted to demonstrate the unreasonableness of Small's decision without calling Small to testify, choosing instead to present only the testimony of the doctors and Mirsky. These witnesses provided no insight into the reason Small acted as he did.

In assessing the decision not to follow-up the initial contact by Cooke, we must be careful not to apply a hindsight analysis. The question is whether an attorney, knowing the circumstances of the crimes his client had been charged with, upon receiving Cooke's letter could reasonably have decided that it would not be worthwhile to consult with him further. From Cooke's testimony, and from the

letter itself, it is apparent that some time before the letter was written on August 18, 1983, Cooke talked on the phone with Small about having done an evaluation of Watson. Small, however, had written to Kool on August 9, requesting that he evaluate Watson. From the informal salutation of Small's letter, it may be inferred that Small was well acquainted with Kool. Thus, at the time he received Cooke's summary evaluation, Small was apparently anticipating a report from a more familiar source.

Cooke's letter expressed the opinion that the shooting of Sheryl Harding, "though committed while psychotic, agitated and depressed, was ... deliberate and intentional and [there was] no basis for insanity or diminished capacity." Earlier in the letter, Cooke indicated a familiarity with the concept of voluntary manslaughter, and his assessment of the shooting of Maxilyn Vann stood in marked contrast to his assessment of the shooting of Sheryl Harding. This alone suggests good reason for counsel not to have pursued Cooke's testimony as an expert.

Mirsky also did not recall being advised, either by Watson or Small, that Watson had been examined by Kool. The lower court found as fact, however, based on the other evidence presented at the hearing, that Mirsky at some point must have become aware of Kool's involvement in the case, since he repeatedly advised Watson's family that Kool's fee had to be paid before he would be available to testify. The court also found from the record that the reason Kool was not used as an expert witness was that Watson and his family were unable to pay for his services. Present counsel derisively characterizes counsel's failure to present Kool as "pocketbook decision making" and suggests that the absence of expert testimony demonstrates that Watson had inadequate opportunity to present a defense. It cannot be ignored that Watson knowingly discontinued his representation by court-appointed counsel in favor of a privately retained attorney. Appointed counsel had sought and been granted funds for psychological evaluation, which had been performed by Cooke. Under these

circumstances, the inability to secure the services of a private psychiatrist cannot be attributed to any professional lapse on the part of counsel. There is no basis for the argument presently advanced that counsel might have been successful in obtaining court approval for payment of Kool's fee. Furthermore, Kool's testimony at the evidentiary hearing did nothing to substantiate present counsel's assertion that he would have been willing to testify for free, and thus the argument that trial counsel was ineffective for not exploring this possibility must fail as well. Ultimately, the question becomes whether Watson received ineffective assistance when Mirsky perpetuated Small's initial decision not to use the court-funded evaluation by Cooke, even after it became apparent that Kool would not appear.

It is true that Watson's counsel at the evidentiary hearing succeeded in having Cooke express an opinion that Watson had acted "in the heat of passion." According to Cooke, he was unaware at the time he evaluated Watson that a killing could be both intentional and lacking in malice, and on this basis be classified as voluntary manslaughter. He had applied his understanding of the voluntary manslaughter criteria to the shooting of Maxilyn Vann, that is, that Watson had an unreasonable belief that he was in danger and acted to protect himself. Because the "unreasonable belief" criteria did not apply to the killing of Sheryl Harding, however, Cooke could find no basis for voluntary manslaughter as to this shooting, and expressed his opinion in the contrasting terms he was familiar with, that the Harding killing was "deliberate and intentional." He did not assess whether Watson's psychological condition could be characterized as "a sudden and intense passion" because counsel had not sought an evaluation in that regard and he was unaware that such a finding could be relevant. Moreover, in characterizing the Harding shooting as "deliberate" he had not intended to offer an opinion that Watson acted with malice. After being informed by post-trial counsel that a person's emotional condition might be such that it could negate the legal element of malice and bring a killing,

though intentional, within the designation of voluntary manslaughter, Cooke expressed his opinion that had Watson's trial counsel consulted with him after receiving the summary evaluation letter and questioned him in terms related to the "heat of passion" defense, he could have given testimony that might have been helpful.

Although sudden intense passion may indeed negate the element of malice necessary to a finding of murder, such passion must be precipitated by serious provocation, and it must be so sudden as to preclude cool reflection. Notwithstanding appellate counsel's assertions that evidence of provocation was of record in this case in the form of anger, jealousy and rage in that Watson was aware that Harding had a new boyfriend at the time he went to her residence, we agree with the lower court that there is not even a scintilla of evidence to establish sufficient *legal* provocation by the victim to support a voluntary manslaughter claim.

Watson moved out of Harding's residence approximately two weeks before the shooting. He made application to purchase a gun two days before the shooting and picked up the gun a mere two hours before the shooting. There was also evidence that shortly after their relationship terminated, Watson threatened Harding with a knife and threatened to kill her during a telephone conversation with her.

At most, Cooke's testimony could have established the nature of Watson's emotional condition, that is, the existence of "passion." Even then, Cooke's uncertain grasp of legal concepts, as demonstrated at the evidentiary hearing, and his prior, seemingly contradictory assessment of Watson, would have been open to exposure on cross-examination, making his testimony more of a liability than an asset. Given the absence of the other elements of a "heat of passion" defense, counsel's failure to make use of Cooke's evaluation cannot be deemed ineffective representation. Counsel acknowledged at the evidentiary hearing that from his experience he perceived a danger that psychiatric evidence could "backfire" if not carefully presented. His chosen course, framing a "heat of passion" defense by

arguing solely from the nature of the events and from the evidence of Watson's good character, diverted attention away from a detailed analysis, which would have exposed the missing links in the chain. That this course was unsuccessful does not establish that it was unreasonable.

■ The appellant also offers a brief argument that counsel was ineffective for failing to produce the testimony of the physicians who treated Watson for his self-inflicted gunshot wound. It is argued that without this testimony, the record failed to indicate the gravity of the harm Watson had done to himself. Such evidence, it is argued, in conjunction with the evidence of Watson's psychotic condition, would have supported an inference that the shooting of Harding was a crime of passion.

This issue cannot be sustained as a claim of ineffective assistance of counsel for the simple reason that trial counsel considered and rejected this approach for reasons apparent on the record. Trial counsel advised the court that he wished to introduce portions of Watson's hospital records for the above stated purpose. Although the court was skeptical of the relevance of these documents, the Commonwealth indicated its willingness to stipulate to the admission of the records if they were admitted in their entirety. Counsel however, sought only a limited admission of the records to establish the extent of Watson's injuries, and rejected the suggestion that he produce the treating physicians for this purpose. It is apparent that the medical records in their entirety give evidence that Watson was lucid and rationale, contrary to the picture of an irrational, psychotic man the defense sought to portray. The testimony of the physicians on cross examination would likewise have been open to such revelations contrary to the defense being presented. Thus even if it is granted for the sake of argument that such evidence would have been relevant, a point in substantial doubt given the absence of the elements of the "heat of passion" defense as noted above, counsel plainly had a reasonable basis for his decision not to pro-

duce this evidence. The risks far outweighed the potential benefits.

Because we have rejected the only claims advanced that go to the validity of the trial at which Watson's guilt of first degree murder, aggravated assault, and possession of instrument of a crime was established, those convictions are affirmed. It becomes our duty to review the sentence of death and the proceedings whereby that sentence was determined.

Watson's first claim, framed in terms of ineffective assistance of counsel, charges that the jury that determined his sentence was improperly constituted under the criteria of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Adams v. Texas,* 448 U.S. 38 (1980), and *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). It is asserted, based on the transcript of the *voir dire* proceedings originally filed by the court reporter, that as to two members of the venire, Watson's counsel joined in the Commonwealth's challenge for cause, and as to one prospective juror, defense counsel alone made the challenge for cause on *Witherspoon* grounds. In light of the extensive litigation by capital defendants seeking to establish that the *state* should not be permitted to excuse for cause persons who oppose the death penalty, and given the United States Supreme Court's insistence that such persons may be eliminated for cause only where their opposition is so firm that it would prevent them from following the law and ruling against the defendant where required to do so, it would seem patently against a defendant's interests for his own counsel to remove or join in the removal of a prospective juror for this reason. Upon examination of the entire record, however, we agree with the lower court that the claim that Watson's counsel made such challenges is wholly frivolous.

With respect to two of these claims, the court determined that the transcript erroneously attributed to Watson's counsel challenges that had been made by the district attorney. In one of these cases, the court reporter, following inquiry

by the court, submitted a letter stating that he had verified from the original Notes of Testimony that the Official Notes contained a typographical error and erroneously recorded "Mr. Mirsky: I challenge for cause," what should have been recorded as "Mr. Bello: I challenge for cause." In both cases, the record of jury selection kept by the court clerk attributed the challenge to the Commonwealth. Upon being questioned at the evidentiary hearing, Mirsky denied that he challenged any potential jurors for cause on this basis and insisted that the transcript was in error.

Present counsel floats the charge that Watson will have been denied due process if effect is given to this correction of the record which has occurred outside the procedures of Pa.R.Crim.P. 9030(c) and Pa.R.A.P. 1926. Those rules provide that "any difference . . . as to whether the record truly discloses what occurred in the lower court . . . shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth." We fail to see how these rules have been violated. Since the appellant raised the issue and indeed produced Mirsky, who offered his recollection of the events, he cannot claim a lack of notice. The evidentiary hearing itself provided the appellant with every opportunity for objection, argument, introduction of evidence, and whatever other means might be available to establish the correctness of the transcript on which the ineffectiveness argument was founded. This matter, as the Bard of Avon would have it, is much ado about nothing.

■ So too, is the third claim that counsel "participated" with the prosecutor in removing a juror who was opposed to capital punishment. In this instance, Mirsky challenged for cause a person who was the friend of a murder victim. Mirsky also elicited the opinion that this man's close relationship with two police officers would probably affect his ability to be fair and impartial. The Commonwealth attempted to "rehabilitate" the venireman, but after ascertaining that he would be unable to impose the death penalty even in an appropriate case, the prosecutor interposed a

challenge for cause. The transcript reflects that Mirsky commented "Yes" following the prosecutor's challenge. From this it is now argued that Mirsky "participated in" the removal of this venireman, against the interests of his client.

Upon reviewing the transcript at the evidentiary hearing, Mirsky was unable to recall specifically why he had not objected, indeed had seemingly assented, when the prosecutor made his challenge. He did, however, agree that there seemed to be good and sound reasons why he, for the benefit of his client, would not have wanted this man to sit on the jury, as well as other reasons why the district attorney would want him removed. Mirsky's testimony only serves to confirm what is apparent from reading the transcript *in context*, that although Mirsky acquiesced in the removal of this prospective juror, he did not do so because of the juror's opposition to the death penalty. Because the appellant has failed to prove that counsel acted contrary to or in disregard of his interests, his claim of ineffective assistance is rejected.

■ Though the record makes disposition of this latter issue relatively simple, it illustrates a difficulty inherent in *post hoc* review of trial conduct generally and jury selection strategy in particular. Put simply, there can be times when counsel may reasonably stand mute where an objection might succeed, and still be acting pursuant to strategy for the benefit of his client. For example, in the present context, if defense counsel is inclined to exercise a peremptory challenge to remove a prospective juror, but the prosecutor makes a challenge for cause even though the *Witherspoon* criteria have not been met, by not objecting to the prosecutor's challenge, counsel achieves the desired result of removing the juror and saves a peremptory challenge for later use. The transcript, however, might reveal only a facially improper grant of a *Witherspoon* challenge, and given the vagaries of the exercise of peremptory challenges counsel's strategy might be lost, even to himself, with the passage of time and fading of memories. Scrupulous

adherence to the presumption that attorneys act in the interests of their clients, and insistence that claimants meet the burden of proving assertions that their attorneys could have had no reasonable basis for their action, is perhaps the best and only resolution of this difficulty.

In this light we have also reviewed the *voir dire* transcript to determine whether nine other potential jurors were improperly permitted to be stricken from the panel. The appellant asserts that because these jurors were not questioned extensively to determine whether their opposition to the death penalty was such a firm conviction that it would prevent them from following their oath and imposing the death penalty in an appropriate case, the Commonwealth's challenge for cause should not have been sustained under *Witherspoon*. As to some, we are satisfied that the prosecutor's questioning adequately established the validity of the challenge, and the absence of attempt to rehabilitate does not constitute ineffective assistance. *See Commonwealth v. Peterkin*, 511 Pa. 299, 320, 513 A.2d 373, 383 (1986). As to others, even if we assume that the *Witherspoon* criteria were not established on the record, there is no basis to conclude that Mirsky was ineffective in allowing them to be removed. In several cases, we may readily infer why defense counsel might not have wanted the members of the venire to serve on the jury: e.g., one's mother had been the victim of a rape, one's daughter had been the victim of a rape, and one was a close friend of several policemen. In short, the appellant has failed to substantiate his argument; we are satisfied that the jury which tried his case was not illegally constituted.

Watson also challenges the imposition of the death sentence. The record indicates that the jury found one aggravating circumstance, "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense," 42 Pa.C.S. § 9711(d)(7), which outweighed the mitigating circumstances found, "[t]he defendant has no significant history of prior criminal convictions," and that

"[t]he defendant was under the influence of extreme mental or emotional disturbance," 42 Pa.C.S. § 9711(e)(1), and (e)(2), respectively. The Commonwealth argued that the aggravating circumstance could be found based on the evidence that Maxilyn Vann had been shot during Watson's approach to Harding's residence, that Harding's two children were in the closet when Watson fired a shot that entered the wall near the closet, and that the police officer who first arrived at the scene kicked the gun from Watson's hand as he lay on the floor. We only address whether the children were endangered by his conduct because we believe they were and that the jury properly found that the defendant knowingly created a grave risk of death to another person under (d)(7). In this regard the appellant asserts that there was no evidence that the appellant knowingly created any danger to the children or that he did in fact endanger the children, during the shooting. In addressing this claim we apply the sufficiency of the evidence test. *Commonwealth v. Albrecht*, 510 Pa. 603, 511 A.2d 764 (1986).

In addressing whether he knowingly created a danger, the record reveals that the appellant lived with the victim for approximately five years, knew that the victim lived with her two children and knew that the children might be in the house at the time of the shooting. We believe this evidence was sufficient for the jury to find that he "knowingly" created a danger to the children. In a day and age where accidental victims of shootings are prosaic, a jury can infer that an individual is "knowingly" endangering a person when that individual uses a gun in any area where he knows that the others could be. This interpretation of (d)(7) is supported by legislative enactment and the prior decisions of this Court. *See* Pennsylvania Uniform Firearms Act, 18 Pa.C.S. § 6101 *et seq.; Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988); *Commonwealth v. Moser*, 519 Pa. 441, 549 A.2d 76 (1988); *Commonwealth v. Smith*, 518 Pa. 15, 540 A.2d 246 (1988); *Commonwealth v. Griffin*, 511 Pa.

553, 515 A.2d 865 (1986); and *Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714 (1984).

Addressing whether he did in fact endanger the children, the record reveals that when the appellant entered the bedroom, he reached into the closet and removed the victim's daughter and then the victim, leaving the victim's son, Daryl in the closet. N.T., 10/3/83, p. 188. The record also reveals that immediately after the appellant removed Mrs. Harding from the closet, he shot her twice, reloaded his gun and shot her again, before turning the gun on himself. During the time the defendant was reloading his gun, Daryl left the closet through another room connected to the closet. At trial the Commonwealth established that there was a bullet lodged near the door frame to the closet. The appellant asserts that the Commonwealth failed to establish that this was one of the bullets he fired; however, the record supports a finding that it was.

The evidence offered to prove this came from two sources, the police officer who found the victim and the appellant in the bedroom and Harding's son Daryl. The officer testified that when he entered the bedroom, he observed a bullet hole in the wall near the closet door frame. N.T., 10/14/88, p. 244. Daryl testified that the hole was not there prior to the shooting. N.T., 10/3/83, p. 400–01. No forensic testimony was offered to establish which of the four shots fired by the appellant caused the hole but the fact that the bullet hole was there, establishes that Daryl's life was in danger.

The testimony clearly established that Daryl was in the closet when the first two shots were fired and that the closet and Daryl were in the appellant's line of fire. From this evidence the jury could have reasonably inferred that Daryl's life was endangered during the killing. The fact that Daryl was lucky is of no import because (d)(7) addresses the risk created by an actor's conduct. *See Commonwealth v. Smith,* 518 Pa. 15, 45, 540 A.2d 246, 260 (1988) (jury properly found that defendant created a "grave risk of

death" where others were in danger of being struck by an errant, ricochet or "pass through" bullet). Thus, viewing this evidence in the light most favorable to the Commonwealth,[1] the jury could properly infer that Daryl's life was endangered during the commission of the murder. Circumstantial evidence is sufficient.[2]

■ Lastly,[3] in all case in which the death penalty has been imposed, we are obligated by statute to review the record and to assure that the death sentence: is not the product of passion, prejudice or any other arbitrary factor;[4] is supported by a finding of aggravating circumstances specified in subsection (d);[5] and is not excessive or disproportionate to the penalty imposed in similar cases....[6] Further pursuant to *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we are obligated to review data and information pertaining to similar cases, compiled by the Administrative Office of the Pennsylvania Courts (AOPC).

We have already considered the aggravating circumstance and believe it to be supported by the record. 42 Pa.C.S. § 9711(d)(7). There is no indication of any prejudice, passion or arbitrary factor, from the record, that infected the jury. They found, as they had a right to, that the evidence offered no acceptable mitigation. Since their

1. *See Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988); *Commonwealth v. Stoyko*, 504 Pa. 455, 475 A.2d 714 (1984).

2. *See Commonwealth v. Yarris*, 519 Pa. 571, 603–04, 549 A.2d 513, 529 (1988); *Commonwealth v. Hardcastle*, 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988); and *Commonwealth v. Holcomb*, 508 Pa. 425, 447, 498 A.2d 833, 844 (1985).

3. The appellant also claims that the Pennsylvania Death Penalty Statute is a violation of due process. This claim is meritless. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

4. 42 Pa.C.S. § 9711(h)(3)(i).

5. 42 Pa.C.S. § 9711(h)(3)(ii).

6. 42 Pa.C.S. § 9711(h)(3)(iii).

verdict is not disproportionate to others similarly situated,[7] we cannot substitute another judgement for theirs.

Based upon the forgoing reasons, we sustain the convictions and affirm the sentences.

STOUT, Former Justice, did not participate in the decision of this case.

NIX, C.J., files a concurring and dissenting opinion.

ZAPPALA, J., files a concurring and dissenting opinion.

NIX, Chief Justice, concurring and dissenting.

## I.

While I concur in the opinion of the Court that the claims of ineffectiveness of counsel addressed to the guilty plea of this trial were without merit, I cannot agree that counsel was not ineffective in participating with the prosecutor in removing a prospective juror who was opposed to capital punishment. Whatever may have been counsel's concerns about the prospective juror, under the facts of this case those concerns should have evaporated when that prospective juror made clear that he would not impose the death penalty even in an appropriate case.

The possibility of an outright acquittal of the charges was nonexistent. The only hope for the defense during the guilty plea was to lower the degree of homicide, and the success of that effort was unlikely. The most realistic objective was that the jury would not unanimously agree upon a sentence of death. Once this venireman's views on capital punishment had been elicited, counsel should have

7. The appellant claims that his sentence is disproportionate in that his is the only case of record wherein a jury has found the aggravating circumstance in 42 Pa.C.S. § 9711(d)(7) to outweigh the mitigating circumstances of 42 Pa.C.S. § 9711(e)(1) and (e)(2). This argument ignores the fact that his is the only case where a jury has found these specific circumstances. This argument further presupposes that a jury has never imposed a sentence of death based upon one aggravating and two mitigating circumstances. Compared to "similar cases" his sentence is not disproportionate. *See* 42 Pa.C.S. § 9711(h)(3)(iii).

put all other considerations aside and fought to resist a challenge of that juror. At the very least, he should have preserved an exception to a grant of the challenge for cause. I deem what the majority charitably refers to as counsel's "acquiescence" to be a clear example of ineffective assistance of counsel. *See Commonwealth v. Johnson*, 496 Pa. 546, 437 A.2d 1175 (1981); *Commonwealth v. Fassett*, 496 Pa. 529, 437 A.2d 1166 (1981); *Commonwealth v. Holzer*, 480 Pa. 93, 389 A.2d 101 (1978); *Commonwealth v. Phelan*, 427 Pa. 265, 234 A.2d 540 (1967), *cert. denied*, 391 U.S. 920, 88 S.Ct. 1803, 20 L.Ed.2d 657 (1968); *Commonwealth ex rel. Washington v. Mahoney*, 427 Pa. 599, 235 A.2d 349 (1967). All of the majority's speculation as to what might have been a legitimate defense strategy cannot obfuscate counsel's dereliction. This ineffectiveness of defense counsel justifies a remand for a new sentencing hearing with effective counsel pursuant to 42 Pa.C.S. § 9711(h).

## II.

I must also disagree with the majority's finding of the aggravating circumstance, 42 Pa.C.S. § 9711(d)(7), with regard to the danger faced by the children of the victim. Section 9711(d)(7) of the statute explicitly permits a finding of an aggravating circumstance where the defendant has *"knowingly* created a grave risk of death to another person...." (Emphasis added.) To my thinking, such a finding necessarily requires an awareness by the defendant of the danger to others created by his conduct. The majority, however, would premise the finding upon facts which suggest *either* that the defendant knowingly created a danger to another person, *or* that he in fact endangered another person. (Slip op. at 19). This standard blurs the distinction between "knowing" endangerment and reckless endangerment, which is a separate offense, 18 Pa.C.S. 2705, and not one of the facts upon which an aggravating circumstance may be found.

Under the instant facts, the sequence of the gunshots is not clear. The Commonwealth has failed to establish that the appellant, at the time the shots were fired, was aware of Daryl's presence in the closet. The fact that he "knew that the children *might* be in the house" is insufficient to support a finding that he knowingly endangered their lives. *See Commonwealth v. Logan*, 519 Pa. 607, 549 A.2d 531 (1988); *Commonwealth v. Moser*, 519 Pa. 441, 549 A.2d 76 (1988). Since this was the only aggravating circumstance the jury had to consider, the sentence of death cannot be allowed to stand. A sentence of life imprisonment should be imposed.

ZAPPALA, Justice, concurring and dissenting.

As the writer, from whom this matter was reassigned, of the portion of the Opinion disposing of the claims of trial error and ineffective assistance of counsel, I cannot do other than join the Opinion to that extent. I dissent from the affirmance of the death penalty.

Examining first whether the shooting of Vann brings the Harding killing within the aggravating circumstance, on these facts I would hold that it does not. The Commonwealth suggests that aggravating circumstance (d)(7) applies because offenses which are logically and temporally related and share common issues of law and fact are part of a single criminal episode, citing *Commonwealth v. Hude*, 500 Pa. 482, 458 A.2d 177 (1983). The flaw in this reasoning is that in *Hude* the principal question was the meaning of the phrase "single criminal episode" in the statute barring a prosecution for one offense where a former prosecution of another offense had already occurred. Section (d)(7) applies not where the grave risk of death and the murder occurred in a "single criminal episode," but where the defendant created a grave risk of death "in the commission of" the murder. Here, the assault on Vann occurred as a prelude to, not in the commission of, the murder.

Similarly, without minimizing that danger, I disagree with the Commonwealth's assertion that whatever danger may

have existed to the officer arriving at the scene implicates this aggravating circumstance. These actions occurred after the commission of the offense and are not properly considered in determining, as is the very purpose of the enumerated aggravating circumstances, whether this particular first degree murder is of a type meriting the extreme punishment of death.

The risk of danger to the children is clearly of the *type* contemplated by the language of (d)(7). I have thoroughly scrutinized the transcripts of the trial and of the sentencing proceeding, however, and must conclude that the Commonwealth did not meet its burden of proving this circumstance beyond a reasonable doubt. In holding otherwise, the majority erects a facade of certainty merely by repetitive use of the word "clearly".

The evidence offered to prove this point came from two sources, the police officer who found the victim and Watson in the bedroom and Harding's son Daral. The officer stated that he observed a bullet hole in the wall near the closet door frame, and that the victim, when he noticed her, was sitting with her back against the wall leaning against the doorjamb. No forensic testimony was offered to establish which of the several shots fired caused the hole. The evidence showed that Watson shot Harding twice, then left the room and reloaded before shooting her again, and that Harding was able to move even after she had been shot three times. In light of this, any inference that the hole was caused by one of the first bullets passing through Harding, and not the third bullet or the bullet Watson shot himself with, has not been established beyond a reasonable doubt. This point is necessary to the Commonwealth's proof because it appears from the testimony that Harding's daughter was no longer in the closet during any of the shooting, and Daral had left the closet before Watson returned and shot Harding a third time before shooting himself. Only if the hole near the closet was made by one of the first shots at Harding could it be said that Watson created a grave risk of death to the children. Unlike the

majority, I find nothing in the testimony that establishes that the closet and Daral were in the line of fire of these first two shots.

More significantly, the Commonwealth failed to produce any evidence that Watson "knowingly" created a grave risk of death to the children. Daral Harding testified that he had entered the closet, which had doors to his room and to his mother's room, after his mother and sister were already there. His testimony indicates that his sister was behind him and in front of his mother. The relative positions of the three is critical to the issue of whether Watson knowingly created a grave risk, because the Commonwealth argued, from the positioning described by Daral, that Watson must have been aware of the childrens' presence when he pulled Sheryl Harding from the closet into her bedroom. However, if the three were in a line with Daral closest to the door to his room, his sister in the middle, and his mother next, then with reference to the door to Sheryl Harding's room, she would have been first, her daughter next, and then Daral. Watson could thus have pulled Sheryl Harding into her room without being aware of Daral's presence.

In *Commonwealth v. Moser*, 519 Pa. 441, 549 A.2d 76 (1988), we used the statutory definition of "knowingly", as it is used in determining culpability with respect to a material element of an offense, 18 Pa.C.S. § 302(b)(2), in applying this aggravating circumstance.

A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

Although circumstantial evidence may support a finding beyond a reasonable doubt that a defendant was aware that his conduct in committing a murder also created a grave

risk of death to persons other than the victim, I am not satisfied that the evidence here reached this level of proof.

Pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), since I find that "the evidence fails to support the finding of an aggravating circumstance specified in subsection (d)," I would vacate the sentence of death and remand for imposition of a sentence of life imprisonment.