952 A.2d 541

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Herbert WATSON, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2006.

Resubmitted Jan. 11, 2008.

Reargued April 15, 2008.

Decided July 22, 2008.

484

488

Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, Jeffrey Krulik, Esq., for Commonwealth of Pennsylvania.

Samuel C. Stretton, Esq., West Chester, for Herbert Watson.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## *OPINION*

Chief Justice CASTILLE.

Today we decide two appeals each presenting the identical issue of whether an inmate who is presently incompetent may be compelled to take psychiatric medication in order to render him competent to determine whether he wishes to pursue relief under the Post Conviction Relief Act (PCRA).[1] In this matter, as in the companion case of *Commonwealth v. Sam*, No. 49 EAP 2005, J–36–2008, —— Pa. ——, 952 A.2d 565, 2008 WL 2853095 (2008), the Court of Common Pleas of Philadelphia County ("PCRA court") denied a request by the Commonwealth to compel the administration of such medication. For the reasons that follow, we reverse the order of the PCRA court and remand for further proceedings consistent with this Opinion.

1. 42 Pa.C.S. §§ 9541–9546.

On November 10, 1983, a jury convicted appellee Herbert Watson of, *inter alia*, the crime of first-degree murder for shooting to death his estranged girlfriend and the crime of aggravated assault for shooting and seriously injuring a friend of the victim's sister. After a penalty hearing, the jury sentenced appellee to death. This Court affirmed appellee's conviction and sentence on direct appeal. *Commonwealth v. Watson*, 523 Pa. 51, 565 A.2d 132 (1989) (relating facts underlying appellee's convictions).

On November 14, 1996, appellee filed a *pro se* PCRA petition. After several reassignments, the case was ultimately assigned to the Honorable David N. Savitt of the Court of Common Pleas of Philadelphia County. An amended petition was finally filed on October 3, 2001.[2] On July 9, 2002, the Commonwealth filed a motion to dismiss the petition. On January 29, 2003, counsel for appellee filed a "Consolidated Response to Commonwealth's Motion to Dismiss, Supplemental Petition for Relief Under the [PCRA], and Motions for Summary Grant of Relief and for An Evidentiary Hearing Under the [PCRA]." Appellee subsequently sent a series of rambling letters to Judge Savitt stating that he had fired his counsel and wished to withdraw his appeals. Consequently, on July 9, 2003, the PCRA court held a hearing, after which it stayed the proceedings and ordered that appellee be examined by the court's mental health unit as well as by two mental health experts retained by defense counsel—psychiatrist Robert L. Sadoff, M.D., and psychologist Gerald Cooke, Ph.D. On September 9th, the court granted a continuance to allow appellee's examination by John S. O'Brien, II, M.D., a psychiatrist retained by the Commonwealth. Drs. Sadoff and Cooke examined appellee on September 17th; on December 9th, appellee was examined by Dr. O'Brien and by the court's psychiatrist, Robert Stanton, M.D.

At a status conference held on May 20, 2004, the Commonwealth requested that the PCRA court issue an order compel-

---

2. In the interim, the first and second appointed counsel withdrew, present counsel (Samuel C. Stretton, Esquire) was appointed, and a death warrant was issued but later stayed by the PCRA court.

ling appellee to take psychiatric medication in order to render him competent to pursue PCRA relief. On June 17, 2004, the court held a hearing at which the parties informed the court that the four experts were in agreement that appellee was currently incompetent to pursue PCRA relief. In addition, appellee's counsel informed the court that appellee's mother, Marie Watson, had agreed to serve as his next friend. On June 22nd, the court issued an order finding appellee presently incompetent and appointing Mrs. Watson as his next friend. As it stated at the hearing, the court felt obliged to formally find appellee incompetent "for the purpose of moving forward," that is, to enable the court to appoint Mrs. Watson as next friend and "dispose of the case." Notes of Testimony ("N.T."), 6/17/04, at 27. The court, however, expressly reserved judgment on the question of whether appellee's competency could be restored. *Id.* at 31.

On October 18, 2004, the PCRA court held the first of two hearings on the issue of whether appellee's competency could be restored. At the first hearing, the defense presented testimony from Dr. Sadoff, one of its two mental health experts. On direct examination, Dr. Sadoff testified that it was his opinion "within reasonable medical certainty" that appellee, "because of his mental illness, which is paranoid schizophrenia and he is psychotic, does not really understand in a rational way the proceedings in which he's involved or the consequences of those proceedings." N.T., 10/18/04, at 22. As to whether appellee was currently a danger to himself or others while incarcerated on death row, Dr. Sadoff opined, based on his review of appellee's prison records, that appellee "has not been violent." *Id.* at 28.[3] As to whether appellee's competency could be restored, when asked by the court

3. Although not necessary for our holding today, we note that, on cross-examination, Dr. Sadoff equivocated on this question. When asked by the prosecution whether appellee "is not a danger to himself or are you not able to say," Dr. Sadoff responded: "Well, I haven't seen any evidence in the correctional medical file that shows that he's tried to kill himself, harm himself or anybody else, either on or off medication, so I can't say that he is or is not. All I can say is we don't have evidence to show that he is." N.T., 10/18/04, at 36.

whether there was "a medication that would be effective in this case," Dr. Sadoff responded as follows:

I don't know, Your Honor. I know he has been tried on a number of different medications. I don't know how long he's taken them. I don't know what dosages he's had, but if he gets the right medication and the proper dosage and is monitored carefully over a period of time and shows improvement, then I would say yes, then it works.

*Id.* at 30. With respect to the side effects of the medications with which appellee had previously been treated, Dr. Sadoff testified as follows:

[F]or the medications that he took there were unsettling side-effects, that's because some of the medication was the old tranquilizers that are now in injectable form. The newer medications don't have that kind of tardive dyskinesia, but they all have some side-effects. But the newer medications have fewer of the serious side-effects than the old medications have.

*Id.* at 32. When asked whether the medications that appellee had taken had failed to restore his competency, Dr. Sadoff responded that he could not answer the question because he did not have the necessary data. *Id.* at 33. Finally, when asked what he would prescribe for appellee, Dr. Sadoff testified as follows:

[I]f he's willing to take it, I'd give him the oral Zyprexa. If he's not willing to take it ... and I have to give him something that I'm sure will stay there, I'll give him an injectable form of either Haldol or Prolixin, but those two have the side-effects that are not so nice....

*Id.* at 34. Dr. Sadoff subsequently identified the "not so nice" side effects of Haldol and Prolixin as "the shakiness that we call dyskinesia." *Id.* at 38.

At the October 18th hearing, the PCRA court also heard testimony from Marie Watson, appellee's mother, whom the court had appointed as his next friend. During examination by appellee's counsel, Mrs. Watson testified as follows:

Q. Now you have met with me with your daughter, Angela Stokes, in my office about a couple weeks ago; am I correct?

A. Yes, sir.

Q. And we discussed all the issues about Mr. Watson's case; am I right?

A. Yes, we did.

Q. We discussed that he had some good legal issues but no one knew where they would go; am I right?

A. Uh-huh.

Q. I discussed that there was a chance that the Court might be willing to impose life imprisonment if we gave up those other issues; do you remember that?

A. Yes, sir, you spoke on that.

Q. And you also had a chance to meet, at my request, with Ms. McCracken from the death penalty organization and Mr. McHugh from the death penalty organization; am I correct?

A. Yes, sir.

Q. You did that at my request and you met them on one or two occasions on this particular issue; am I right?

A. Yes, sir.

Q. And **based on all those conversations,** you understand it's in the interest of your son to live and not to be put to death; am I correct?

A. Yes, sir.

N.T., 10/18/04, at 43–44 (emphasis added). At this point during Mrs. Watson's testimony, the PCRA court interjected, prompting the following additional testimony:

Q. Well, let me ask you this. That's your opinion; is that right? You want him to live?

A. It's not totally my opinion. I think he deserves to live.

Q. Do you think he knows what he's doing when he says he wants to die?

A. No, sir. No, sir. If that was so, I would have went [sic] home when he said go home.

*Id.* at 44–45. Thereupon, appellee's counsel questioned Mrs. Watson as to her willingness to agree to accept life imprisonment on appellee's behalf, to which she responded: "I would be willing. I don't want him to die." *Id.* at 46. At this point, the court again interjected, prompting the following additional testimony from Mrs. Watson:

Q. You don't want him to die, that's what you don't want. But the question is, if you're his best [sic] friend, your obligation isn't necessarily to do what you want, it's to do what he wants.

A. Yes, sir.

Q. Now you know him, he's your son, you've talked to him; is that correct?

A. Yes, sir.

Q. What does he want?

A. I would hope it would not be to die. I don't really think he wants to die. I think he has decided if he has to live like he's been living, it would be better to be dead.

Q. Well, is that a reasonable—some people make that decision and that doesn't mean you're incompetent, because the option then that you've been asked is to give up any claims he has and he will do life imprisonment without parole; is that what you think he wants?

A. No, sir.

Q. You think he wants to be exonerated?

A. Well, I think he's been here all the time, he did the suffering and I think he wants justice. I think he wants justice.

*Id.* at 46–47.

After briefly hearing testimony from appellee's sister, Angela Stokes, the PCRA court concluded the October 18th proceeding by hearing testimony from appellee himself. Although portions of it are incoherent, appellee's testimony does include a direct response to the court's pointed question, "You want the death penalty?":

**Yes, I do.** People just got up there. I'm concerned about my mother because my mother wouldn't be there normally. Normally she don't get involved. They saying they said something I be having a mental problem. I never had a mental problem at all in my life. The only reason I took medication was harassments in the prison. And when they came out there and saw me before, I told them that. The psychiatrist said something about me having a mental problem. Every time he came out there I spoke saying the letter that I wrote you don't say anything on it, and made it clear, the same way I'm speaking now, which says nothing wrong with me. But what you just said that death only applies—like I said, I've been down a long time. It don't have anything to do with life sentence. I've been doing time. Jail is jail. It have to do with something that's death and then the person, the case, it [the victim] was my common law wife. And it just never set right to me in the beginning. All have to be judged now. I don't say anything about God to a psychiatrist. I could, I don't know why he came up to weak stuff, which is obvious.

And then the second in line—everybody—which if you be a Judge, you see that and that's why you're there to show that people show that. And that's all it is, but that's what it is and **in this case clearly death penalty applies.** I've been down on death row and that's the decision. I don't want to burden my family. Normally they don't get involved. **I don't need a lawyer.** The lawyer over here is a bad one. He is efficient to on the letters. It would not be hard to understand because it shows everything I said that he would do, he did. **I don't want him on the case and he came on. He's not representing me; he's doing what he want to do.** A lawyer would have to represent the truth on what a person said. If I said I'm guilty, how can he represent a lie. He said a lot about what I'm saying. So that's it.

N.T., 10/18/04, at 57–59 (emphasis added).

On November 22, 2004, the PCRA court held a second evidentiary hearing at which Dr. O'Brien testified for the

Commonwealth on the issue of whether appellee's competency could be restored. During direct examination of Dr. O'Brien, the prosecution introduced medical records corresponding to appellee's four involuntary commitments, which occurred between December 1995 and May 2003. Dr. O'Brien noted that the commitment records "document that [appellee]'s recurrently hospitalized as a result of aggravation of his symptoms, which include aggressiveness towards others, either verbally or actual physical aggressiveness, and also dangerousness to himself in terms of losing weight by undergoing a hunger strike, as an example, but also verbalizing a desire to kill himself." N.T., 11/22/04, at 24.

After being questioned in some detail as to a sampling of the records, Dr. O'Brien testified more generally as follows:

Q. So ... when he is not under treatment or medication, he becomes incompetent ... ?

A. Yes, that's correct.[4]

Q. But he can be treated?

A. Yes. And the treatment is effective for him as documented in the records.

Q. And when he's treated, is it your opinion that he is competent?

A. Yes, it is my opinion he's competent.

*Id.* at 24–25.

Before concluding direct examination, the prosecution asked for the court's permission to "go through the factors that were discussed in *Sell[ v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) [5]]." N.T., 11/22/04, at 29. With respect to the *Sell* factors, Dr. O'Brien testified as follows:

4. On cross-examination, Dr. O'Brien testified, consistently with Dr. Sadoff, that it was his opinion that appellee was incompetent due to "[s]chizophrenia, chronic paranoid type." N.T., 11/22/04, at 33.

5. In *Sell*, the U.S. Supreme Court held that

the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the

Q. Dr. O'Brien, what medication would you recommend to restore Mr. Watson to competence?

A. Antipsychotic medication. He's been on Zyprexa and Risperdal. These are good medications to treat his conditions and he's responded to those in the past.

Q. And you may have answered this before, but bear with me, would these medications interfere with his ability to assist counsel in conducting a hearing?

A. No, they would not. In my opinion, and that's based upon my knowledge and familiarity with the medications as a treating doctor who prescribes them, but also my review of the records of Mr. Watson's actual response to the medications, and I've not observed in the records that he has exhibited side effects to the medications that I mentioned or really any of the other medications that I've seen used to treat him that would impair his ability to participate and assist in the proceedings.

Q. Okay. And are there any less intrusive means of treating or restoring Mr. Watson to competent [sic] other than medicating him?

A. No, in my opinion there is nothing. He's been basically under the supervision of clinical personnel for many years and it's only during periods of time that he's actually taking his medications that his symptoms are under control.

Q. Okay. And in your opinion is administering these drugs to restore the defendant to competence medically appropriate under the circumstances?

A. Well, treating his condition is medically appropriate with the medications that I mentioned or any antipsychotic medications because those are the medications that a physician would select to appropriately treat his condition.

*Id.* at 30–31.

Notwithstanding this testimony, at the conclusion of the hearing, the court inexplicably found that "treatment and/or

> trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests. *Sell,* 539 U.S. at 179, 123 S.Ct. 2174.

medication could not and would not result in the defendant being sufficiently competent to proceed." *Id.* at 82. Accordingly, the court directed Mrs. Watson to cooperate with appellee's counsel in pursuing relief under the PCRA and scheduled a hearing on the merits of appellee's PCRA petition. On December 15, 2004, the court entered an order certifying the matter for interlocutory appeal under 42 Pa.C.S. § 702(b),[6] and the Commonwealth timely filed a petition for permission to appeal pursuant to Pa.R.A.P. 1311. On March 8, 2005, however, this Court issued an order denying the Commonwealth's petition.

Following this Court's order, the PCRA court held a status hearing on May 4, 2005. At the hearing, after reciting the recent procedural history of the case, the PCRA court noted the following:

> ... I received a copy of a letter that mother Marie Watson sent to the Honorable Governor Ed Rendell; and as a result of reading that letter, although I have great respect and feeling for the mother of the defendant here, it appears that there's a substantial likelihood that she may not be an appropriate person to be able to very dispassionately determine the defendant's right [sic] as his next friend or guardian.

N.T., 5/4/05, at 4–5. Nevertheless, after a discussion off the record that led it to believe that the possibility remained that the case could "be disposed of by some type of agreement," *id.* at 13,[7] the PCRA court continued the matter until September

6. Section 702(b) of the Judicial Code provides as follows:

 (b) **Interlocutory appeals by permission.**—When a court or other government unit, in making an interlocutory order in a matter in which its final order would be within the jurisdiction of an appellate court, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter, it shall so state in such order. The appellate court may thereupon, in its discretion, permit an appeal to be taken from such interlocutory order.

 42 Pa.C.S. § 702(b).

7. The court's statement immediately followed a discussion with counsel off the record, which makes it difficult to discern the nature of the

2005 without making a ruling on Mrs. Watson's next friend status.

Finally, on September 11, 2005, the PCRA court issued a brief opinion explaining its reasons for concluding that it should deny the Commonwealth's request that appellee be compelled to take psychiatric medication in order to enable him to pursue PCRA relief. The court's entire rationale as explained in the opinion is as follows:

> The Commonwealth claims that this Court's ruling "essentially puts an end to this case by rendering it impossible to carry out the execution (or for all practical purposes even move forward with the current proceeding)." That contention is belied by the record. Prior to this appeal, the matter was scheduled to proceed with the PCRA hearing on May 2, 2005, with the defendant represented by the "next friend" (his mother) and counsel. This procedure was approved by the Pennsylvania Supreme Court in *Commonwealth v. Haag*, 570 Pa. 289, 809 A.2d 271 (2002). Moreover, at the hearing on the defendant's competency, this Court determined, based on the testimony, that the defendant was not a danger to himself or others and therefore, could not be involuntarily medicated in an attempt to render him competent (see testimony of Dr. Robert Sadoff, 10/18/04 N.T. at 14–39). This was also based on the prison records submitted which disclosed that the defendant had been incarcerated for over 20 years in various institutions and had **no** history of violence to himself or others. Thus, while diagnosed as incompetent, this Court determined that, absent evidence the defendant is a danger to himself or others an order to involuntarily medicate him would be violative of the law. See *Haag*, supra, and *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

PCRA Ct. Op. at 2.[8] The Commonwealth subsequently sought reconsideration of our March 8, 2005 order denying its petition

anticipated agreement. In its brief to this Court, however, the Commonwealth asserts that it "offered relief with respect to [appellee]'s sentence, if he would agree to dismissal of all challenges to his convictions." Commonwealth's Brief at 32.

**8.** As we note in *Sam:*

for permission to appeal, noting that the PCRA court's opinion identified different legal grounds than articulated at the November 2004 evidentiary hearing. This Court granted oral argument, which was heard on October 16, 2006, the same day that arguments were heard in *Commonwealth v. Sam, supra.* The two cases were reargued on April 15, 2008.

### Appealability

Before proceeding to the merits of the Commonwealth's appeal, we first consider the contention of appellee's counsel[8] that this Court lacks jurisdiction because the order of the PCRA court is an interlocutory order that is not subject to immediate appeal. The Commonwealth responds that it is entitled to immediate review under Pa.R.A.P. 313, which allows appeals as of right from a collateral order of a lower court, and, alternatively, that this Court should exercise plenary jurisdiction pursuant to 42 Pa.C.S. § 726.

Under Rule 313(b), an order is considered collateral—and, therefore, appealable as of right—if: (1) the order is "separable from and collateral to the main cause of action"; (2) "the right involved is too important to be denied review"; and (3) "the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). With respect to the first requirement, both parties agree that the order at issue is separable from and collateral to the main cause of action. Indeed, the issue of whether appellee should be compelled to take psychiatric medication is completely distinct from, and has no bearing on, the questions of whether he wishes to pursue, and whether he is entitled to, collateral relief. We thus proceed to

---

Although it is counsel who advocate, we generally attribute arguments to the parties whom they represent. Doing so would be, at best, misleading in this case, however, as it is not only the argument that he articulates but also the position he advances in opposing the Commonwealth's motion that are counsel's alone, as all parties agree that appellee remains incompetent to decide whether to pursue post-conviction relief....

*Sam,* 952 A.2d at 576, n. 15. The point rings even truer here than it did in *Sam,* as this appellee has repeatedly expressed his desire to be executed and not to pursue collateral relief. *See, e.g.,* N.T., 10/18/04, at 57–59.

address the other two requirements of the collateral order rule, which appellee's counsel argues are not satisfied here.

Regarding the second requirement of Rule 313(b), the Commonwealth offers several reasons why the right implicated by these appeals is too important for immediate review to be denied. First, the Commonwealth argues, "the issue of involuntary medical treatment 'raises questions of clear constitutional importance.'" Commonwealth's Brief at 2 (quoting *Sell,* 539 U.S. at 176, 123 S.Ct. 2174). Second, the Commonwealth contends, the order below also concerns "important public interests beyond those of the immediate litigants." *Id.* In particular, the Commonwealth asserts that the PCRA court's ruling frustrates the societal interest in the finality of criminal proceedings and that the issue presented will likely recur in future capital cases, in which defendants often allege mental incompetence.

With respect to the third requirement, the Commonwealth argues that, "[b]y its very nature, the claim will be irreparably lost if the instant appeal is not allowed." *Id.* at 4. The result of this Court's denying review, the Commonwealth contends, would be "the very harm sought to be avoided, *i.e.,* indefinitely delaying resolution of this case by requiring the Commonwealth to litigate PCRA proceedings against a purported next friend, which will not finally conclude [appellee]'s appeals." *Id.*

In response, appellee's counsel attempts to distinguish the instant case from *Sell.* Regarding the second requirement, counsel asserts that these appeals do not implicate an important right because the PCRA court denied the Commonwealth's request. Noting that the *Sell* court held that "an order **requiring** involuntary treatment satisfies the 'importance' requirement," appellee's counsel argues that the second requirement of Rule 313(b) is not satisfied here because the Commonwealth's appeal "does not seek to protect any right [ ] of clear constitutional importance." Appellee's Brief at 37. As for the third requirement, appellee's counsel would distinguish the instant case from *Sell* based on the outcome in the lower court. In *Sell,* appellee's counsel notes, denying review

meant that the defendant certainly would be medicated so that the case could proceed to trial, a harm that could not be undone even if he were ultimately acquitted. Here, counsel argues, the Commonwealth as the losing party merely "speculates that Mr. Watson might eventually regain competency and might then seek to raise new claims," a harm too speculative to allow for an appeal under Rule 313(b). *Id.* at 37–38.

■ Taking the third requirement of Rule 313(b) before the second, we initially determine whether "the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). In the instant case, if we do not grant immediate review, the question of whether appellee can be compelled to take psychiatric medication to restore competence to decide whether he even wants to pursue collateral relief will never be definitively answered. As a result of the dispositive order of the PCRA court, appellee's competence is no longer relevant, and whether to pursue collateral relief becomes a matter for Marie Watson, appellee's mother and next friend, to decide. In other words, if review is denied here, the Commonwealth's claim that compelled medication is permissible to ensure a single, comprehensive PCRA proceeding simply disappears forever; the third requirement of the collateral order doctrine is therefore easily satisfied.

■ Application of the second requirement of Rule 313(b) requires a more extensive analysis. We first note that, under Rule 313(b), "it is not sufficient that the issue be important to the particular parties. Rather it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva v. Frisk,* 555 Pa. 589, 725 A.2d 1209, 1213–14 (1999). Moreover, the "overarching principle" in determining the importance of an issue for purposes of Rule 313 is that "an issue is important if the interests that would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by adherence to the final judgment rule." *Ben v.*

*Schwartz,* 556 Pa. 475, 729 A.2d 547, 552 (1999) (internal quotation marks omitted).

In determining whether the finality interest invoked by the Commonwealth satisfies the importance requirement of the collateral order doctrine, we are guided by our discussion in *Commonwealth v. Sam* of whether that interest is sufficiently important to satisfy the important government interest prong of the *Sell* test for the involuntary administration of medication:

> There is absolutely no doubt that there is an enduring societal interest in the finality of criminal proceedings. Indeed, "[o]ne of the law's very objects is the finality of its judgments." *McCleskey v. Zant,* 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). "Finality is essential to both the retributive and the deterrent functions of criminal law for neither innocence nor just punishment can be vindicated until the final judgment is known." *Commonwealth v. Haag,* 570 Pa. 289, 809 A.2d 271, 287 (2002) (Castille, J., concurring) (quoting *Calderon v. Thompson,* 523 U.S. 538, 555, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)) (internal quotation marks omitted); *see also Teague v. Lane,* 489 U.S. 288, 309, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion) ("Without finality, the criminal law is deprived of much of its deterrent effect."). That societal interest in finality encompasses a concern for the victims of crime and their families. *See Haag,* 809 A.2d at 287 (Castille, J., concurring) (quoting *Calderon,* 523 U.S. at 556, 118 S.Ct. 1489) ("[I]t is only with real finality that the victims of crime can move forward knowing the moral judgment of the State will be carried out."). This compelling interest in finality that is shared both by society and the state absolutely requires, to put it simply, that "[a]t some point litigation must come to an end," *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638, 643 (1998).

> In Pennsylvania, the societal interest in finality is not just a notion of criminal theory; rather, it is reflected in the very letter of our PCRA. Indeed, the primary intent of many of the Act's 1995 amendments was to narrow the

grounds for collateral relief and thereby establish a scheme by which collateral petitions may be processed promptly in order to achieve finality. *Commonwealth v. Morris*, 565 Pa. 1, 771 A.2d 721, 739 (2001); *Peterkin*, 722 A.2d at 642–43. The General Assembly's intent to achieve finality in PCRA proceedings is particularly evident in the Act's provision for stays of execution. *Morris*, 771 A.2d at 749 (Castille, J., concurring); 42 Pa.C.S. § 9545(c)(1) (providing that PCRA is only source of authority for issuing stay); 42 Pa.C.S. § 9545(c)(2) (requiring "strong showing of likelihood of success on the merits" before stay may be issued). This provision, perhaps more than any other contained in the PCRA, reflects the General Assembly's recognition that the reason why convicted defendants are permitted to seek collateral relief is "not to provide convicted criminals with the means to escape well-deserved sanctions, but to provide a reasonable opportunity for those who have been wrongly convicted to demonstrate the injustice of their conviction[s]." *Peterkin*, 722 A.2d at 643. In reviewing collateral appeals, it is the role of this Court to distinguish between the wrongly or unfairly convicted and those who deserve their sanctions. In doing so, we are not blind to the fact that, in capital cases, for those who fall into the latter category, "delay is often an end in itself." *Haag*, 809 A.2d at 286 (Castille, J., concurring) (quoting *Commonwealth v. Michael*, 562 Pa. 356, 755 A.2d 1274, 1284 (2000) (Castille, J., concurring)); *cf. Morris*, 771 A.2d at 734 (recognizing that, because appeal was capital defendant's second PCRA petition, the potential that he was "merely using the process to delay the execution of his sentence [wa]s greater"). Particularly in capital cases, "we cannot ignore that at some point in the proceedings society's interest in finality becomes overarching." *Morris*, 771 A.2d at 739; *cf. id.* at 734 (noting that Commonwealth's interest in finality is "more compelling" when litigating a second PCRA petition).

*Sam*, 952 A.2d at 576–77.

In the instant case, by seeking review of the PCRA court's denial of its request that appellee be compelled to take

psychiatric medication to restore his competence, the Commonwealth is attempting to vindicate society's compelling interest in bringing an end to the litigation of this case, which is now well into its third decade. Counsel's argument that no constitutional rights of appellee are at stake because the Commonwealth did not prevail below misses the point. Importance is not one-sided. We have never subscribed to such a slanted interpretation of what Rule 313 means by "right[s] ... too important to be denied review." *See Ben, supra* (speaking of "interests" along with rights); *Commonwealth v. Dennis,* 580 Pa. 95, 859 A.2d 1270, 1278 (2004) (same). In fact, this Court recently declined to adopt such a rigid application of the collateral order doctrine when allowing immediate review of a case involving a federal interest in the finality of civil cases. *See Pridgen v. Parker Hannifin Corp.,* 588 Pa. 405, 905 A.2d 422, 433 (2006) (determining applicability of federal statute of repose for product liability claims against aircraft manufacturers to be sufficiently "important" under Rule 313(b)); *see also Dennis,* 859 A.2d at 1278 (allowing immediate review of appeal involving party's right to exercise protections of work-product doctrine); *Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939, 944 (2005) (following *Dennis* ). Accordingly, we conclude that the finality interests implicated by the instant appeal are of such importance that this Court should grant review.

Moreover, there is a liberty interest implicated in this case as well. A death row inmate enjoys the right to personally determine whether he wishes to institute a collateral attack upon a final judgment and sentence of death. To hold that a PCRA court's finding that a prisoner on death row cannot be medicated to determine whether he would agree with and approve of the course that his next friend would take substitutes the judgment of the friend for the self-determination of the individual. If, of course, medication were to prove incapable of restoring the defendant's competence, the next friend procedure could be invoked. But, that is not an equivalent substitute for the defendant's self-determination. It is obviously a matter of public importance that this Court ultimately

determine in the first instance whether it is the next friend, or an inmate medicated to the point of competence, who should determine whether to pursue a collateral attack. Because the Commonwealth has satisfied all three requirements of Rule 313(b), we hold that the PCRA court's denial of the Commonwealth's request that appellee be compelled to take psychiatric medication is an appealable collateral order and, therefore, subject to our immediate review.[9]

### *Merits of Commonwealth's Appeal*

This Court reviews the PCRA court's findings of fact to determine whether they are supported by the record. *Commonwealth v. Reaves,* 592 Pa. 134, 923 A.2d 1119, 1124 (2007). We review the PCRA court's conclusions of law to determine whether they are free from error. *Id.* Our scope of review is limited to "the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." *Id.*

Before proceeding to the parties' respective arguments, we first review the High Court's decision in *Sell,* which provides the framework for the resolution of the case *sub judice. Sell* recognized that "an individual has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Sell,* 539 U.S. at 178, 123 S.Ct. 2174 (quoting *Washington v. Harper,* 494 U.S. 210, 221, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)). As previously mentioned, the *Sell* Court established four conditions before the Government can "involuntarily [ ] administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial," thus overriding his liberty interest. *Sell,* 539 U.S. at 179, 123 S.Ct. 2174. Specifically, before issuing an order authorizing the involuntary administration of such drugs, a court must conclude that: (1) "important governmental interests are at stake"; and that administering the medication: (2) will "significantly further those concomitant state

---

9. Accordingly, we need not address whether it would be appropriate for this Court to exercise plenary jurisdiction under 42 Pa.C.S. § 726.

interests"; (3) "is necessary to further those interests," taking account of less intrusive alternatives; and (4) "is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition." *Id.* at 180–81, 123 S.Ct. 2174 (emphasis omitted).[10]

In establishing the above four conditions, however, the *Sell* Court emphasized that they are not always applicable whenever the Government seeks to compel a defendant to take antipsychotic medication:

> We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant **competent to stand trial.** A court need not consider whether to allow forced medication for that kind of purpose, if forced medication is warranted for a **different** purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his health gravely at risk.

*Id.* at 181–82, 123 S.Ct. 2174. As this Court notes in our companion case:

> The above caveat in *Sell* is significant, as the Court explicitly "emphasize[d]" that the purpose for which medication would be administered affects the evidentiary showing required. In *Sell,* the purpose of forced medication was to render the defendant competent to stand trial, an outcome the defendant (or his counsel) did not desire. In contrast, the purpose of forcibly medicating appellee in this case is to enable him to pursue PCRA relief if, once rendered competent, he so chooses. The PCRA serves an important sub-

10. The *Sell* Court derived its four-part test from the Court's decisions in *Harper, supra* (holding that danger to self or others is permissible basis for compelled administration of antipsychotic drugs to treat serious mental illness) and *Riggins v. Nevada,* 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (noting that, "[u]nder *Harper,* forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness").

stantive, and failsafe, purpose exclusively for the benefit of convicted criminals—it exists to allow for vindication of persons who are actually innocent, or, if not innocent, at least have a colorable claim to a lesser sentence or conviction, or a claim to a new trial. An inmate who is entitled to relief should not be arbitrarily denied the prospect of collateral review. In short, compelled medication in a case like this would vindicate the inmate's interests. If PCRA relief were not pursued, then that avenue would be waived. Therefore, the *Sell* caveat is relevant here—*i.e.,* the Commonwealth should not have to meet the four strict *Sell* conditions because it is not seeking an end that is against appellee's interest.

*Sam,* 952 A.2d at 574–75 (footnotes omitted).

Nevertheless, the parties assume that *Sell's* four-factor test applies for purposes of deciding the instant appeal. *See* Commonwealth's Brief at 30–38 (arguing that "[e]ach of the [*Sell* ] requirements was established before the PCRA court"); Appellee's Brief at 31–35 (applying four *Sell* prongs to facts *sub judice* ).[11] Although, for the reasons cited above, we do not believe that the four factors are constitutionally commanded, for purposes of explication, we will track that analysis here as in *Sam,* while weighing the distinction into the balance.

In challenging the PCRA court's denial of its request that appellee be compelled to take psychiatric medication to render him competent to pursue PCRA relief if, once competent, he so chooses, the Commonwealth argues that the PCRA court erred as a matter of law in determining that "absent evidence the defendant is a danger to himself or others an order to involuntarily medicate him would be violative of the law." Commonwealth's Brief at 28 (quoting PCRA Ct. Op. at 2). The Commonwealth contends that *Sell,* which the PCRA court cited for this proposition, "expressly refutes" it. *Id.* at 29 (noting that *Haag, supra,* which the PCRA court also cited, is

11. Although he asserts that *Sell* "concerns only involuntary treatment in order to make an accused competent to **stand trial**" (Appellee's Brief at 31), appellee's counsel defends the PCRA court's *Sell* analysis rather than challenging its application of the *Sell* standard.

inapposite). Applying *Sell* to the facts *sub judice*, the Commonwealth argues, necessarily yields the conclusion that the PCRA court erred in denying the Commonwealth's request.

To support the proposition that it could not legally order that appellee be medicated absent evidence that he posed a danger to himself or others, the PCRA court cited two authorities: *Haag* and *Sell*. In citing *Haag*, the PCRA court apparently was adverting to the fact that the instant case was scheduled to proceed, with appellee represented by Mrs. Watson, whom the court had appointed to serve as appellee's next friend.

In *Haag*, this Court held that, "when represented by a next friend and counsel, a prisoner's incompetence is not a bar to effective collateral review in a death penalty case." *Haag*, 809 A.2d at 278. *Haag*, however, merely begs, rather than answers, the question *sub judice*, for the only alternative to proceeding through a next friend perceived or discussed in *Haag* was "an indefinite suspension of PCRA proceedings," which would prevent the resolution of issues "while evidence and memories are still fresh." *Id.* at 280. Conversely, in the instant case, the Commonwealth has advanced a more comprehensive alternative to proceeding through a next friend, with the prospect of a later proceeding if the defendant returned to competence. Specifically, the Commonwealth seeks to promptly restore appellee's competence through the administration of antipsychotic drugs, thereby allowing him to make his own rational decision as to the more fundamental question of whether to pursue PCRA relief and, if so, to assist counsel. *Haag* does not prevent this course. Nor did *Haag* purport to lay down a legislative-type rule that would prevent consideration of alternative, and more promising, review paradigms. Therefore, because *Haag* is readily distinguishable, we turn to the PCRA court's reliance upon *Sell*.

As in *Sam*, the Commonwealth first argues, pursuant to *Sell*, that the societal interest in the finality of capital cases is sufficiently important to justify compelling appellee to take psychiatric medication in this instance. Noting that, under

*Sell,* the seriousness of the crime is relevant in determining whether important governmental interests are at stake, the Commonwealth observes that this is a capital case and therefore involves crimes "of the utmost seriousness and importance." Commonwealth's Brief at 30. The finality interest is particularly strong here, the Commonwealth contends, for two reasons: (1) almost a quarter century has passed since appellee was sentenced, "an absurd amount of time even by the standards of capital litigation," *id.*; and (2) the Commonwealth has offered relief with respect to appellee's sentence—*i.e.,* conversion to a life term—contingent upon his agreeing to the dismissal of all challenges to his convictions, an offer the Commonwealth will not extend to appellee's next friend "since such an agreement may be voided by [appellee] at his whim," *id.* at 32.

In addition to society's finality interest, the Commonwealth asserts "the obvious interest in allowing [appellee] to control the course of his own appeals." Commonwealth's Brief at 34. The Commonwealth contends that this autonomy interest, which it also invokes in *Sam,* is particularly strong here because appellee's next friend has indicated her willingness to follow actions that, by her own admission, she believes are contrary to appellee's own wishes.

Like counsel for Sam in our companion case, appellee's counsel responds by distinguishing the Commonwealth's finality interest here from the federal government's interest in bringing Sell to trial. Counsel for appellee emphasizes that, no matter what our holding is today, appellee will remain incarcerated on death row. Thus, appellee's counsel argues, "the Commonwealth's cries of 'finality' ring hollow—the only real blow to finality here is **this interlocutory appeal,** which unnecessarily delays these proceedings and wastes judicial resources." Appellee's Brief at 33. Counsel for appellee does not address the autonomy interest asserted by the Commonwealth.

We have already determined that the finality interest that the Commonwealth invokes in seeking the involuntary administration of psychiatric medication to render appellee compe-

tent to determine whether to pursue PCRA relief satisfies the importance requirement of the collateral order doctrine. *See supra* at 552–54. Our reasoning in that context equally justifies the Commonwealth's reliance here on the finality interest in satisfying the first factor of *Sell*. The fact that a next friend has been appointed does not ensure the same degree of finality that a medicated and competent inmate could. To begin with, the PCRA court has already expressed hesitation about Mrs. Watson's suitability as appellee's next friend. As the PCRA court noted at the May 2005 status hearing, "there's a substantial likelihood that [Mrs. Watson] may not be an appropriate person to be able to very dispassionately determine [appellee]'s right [sic] as his next friend." N.T., 5/4/05, at 4–5.

More importantly, as the Commonwealth notes, appellee's counsel has already sought assurances from the PCRA court that, should appellee regain competence "at some future time," counsel would be permitted "to file ... any additional claims that were subsequently identified." [Appellee]'s Notice of Filing Supplemental Exhibits & Legal Authority at 3 (unnumbered), at Reproduced Record at 333a. Counsel presumably was relying on *dicta* to that effect in *Haag*, which speculated that, if Haag regained competence after his next friend failed to obtain PCRA relief, "Haag would have the opportunity to seek review of claims otherwise unavailable under the PCRA, but unraisable in his first petition due to his incompetence." [12] *Haag*, 809 A.2d at 280 n. 11. Although three Justices expressed concern that such claims would not be cognizable under the PCRA in its current form, *see id.*, 809 A.2d at 289 (Castille, J., concurring); *id.* at 291–92, 809 A.2d 271 (Zappala, C.J., dissenting, joined by Nigro, J.), this Court has not directly confronted the question. In any event, merely to litigate the validity of the *Haag* theory, as the Commonwealth suggests, further delays resolution of appellee's appeal. Therefore, given the prospect that the instant PCRA litigation

[12]. The Majority's speculation on this point was, in the view of this author, inaccurate and unwise. *See Haag*, 809 A.2d at 287–89 (Castille, J., concurring).

via a next friend may serve as little more than a dress rehearsal for a future PCRA proceeding, the finality interest identified by the Commonwealth rings true enough. Moreover, the instant case, like *Sam:*

> clearly implicates the *Sell* caveat, *see Sell,* 539 U.S. at 181–82, 123 S.Ct. 2174 (recognizing possible existence of "different purposes" for compelled medication such as "purposes related to the individual's own interests"). Medicating appellee so that he can decide whether to pursue PCRA relief, and then assist in its pursuit if he desires collateral review, is in **appellee's** interest.

*Sam,* 952 A.2d at 579. Therefore, we hold that the Commonwealth satisfied the first prong of the *Sell* test.

 Consistently with *Sell,* we next examine whether the involuntary administration of antipsychotic drugs will significantly further the Commonwealth's interest in finality and appellee's concomitant interest in making his own rational determination as to whether to pursue PCRA relief. This factor requires the Commonwealth to show that administration of such medication is: (1) substantially likely to render appellee competent; and (2) substantially unlikely to have side effects that will interfere significantly with his ability to assist counsel. *Sell,* 539 U.S. at 181, 123 S.Ct. 2174.

The Commonwealth asserts that its expert psychiatrist, Dr. O'Brien, addressed both of these requirements in his testimony. In particular, the Commonwealth cites Dr. O'Brien's testimony that: (1) if medicated, appellee would be competent to represent his own interests; and (2) the newer antipsychotic drugs he recommended (Zyprexa and Risperdal) would not cause side effects impairing appellee's ability to assist PCRA counsel. The Commonwealth further notes that, when testifying for the defense, Dr. Sadoff did not identify any adverse side effects from these newer medications and agreed that they have fewer side effects than older medications. Thus, the Commonwealth argues that the PCRA court erred in finding that such medication "could not and would not" restore appellee's competence, emphasizing that the PCRA court cited no evidence to support this finding.

In response, appellee's counsel argues that the PCRA court's finding that "treatment and/or medication could not and would not result in the defendant being sufficiently competent to proceed" is a finding of fact that is supported by the record "and, thus must be deferred to by this Court." Appellee's Brief at 34. According to appellee's counsel, Dr. Cooke, the defense's expert psychologist, "found that drugging will **not** make Mr. Watson competent." *Id.* at 21. Moreover, appellee's counsel asserts, defense psychiatrist Dr. Sadoff testified that "it would require **speculation** to conclude that forced drugging will make Mr. Watson competent." *Id.*

As the Commonwealth notes, Dr. O'Brien testified that it was his opinion that antipsychotic medication would render appellee competent to pursue PCRA relief. In reaching this conclusion, Dr. O'Brien relied upon the records from each of appellee's four involuntary commitments, which showed that appellee's symptoms abated once he resumed taking medication—namely, Zyprexa and Risperdal. Dr. O'Brien further opined that the re-administration of one or the other of these medications would not cause side effects that would interfere with appellee's ability to assist PCRA counsel. In rendering this opinion, Dr. O'Brien relied upon not only his knowledge of and familiarity with these medications as a treating physician but also his review of appellee's actual response to the medications in the recent past. The PCRA court did not state that it discredited this testimony or, if so, why.

Appellee's counsel's characterization of this question is not persuasive. Neither of the two defense experts forwarded the unequivocal conclusions that counsel presently advocates. In asserting that Dr. Cooke found that medication would not render appellee competent, appellee's counsel cites no record evidence. Counsel, instead, appears to be referring to the representation he makes in his "Counter-statement of the Case" in his brief to this Court that "Dr. Cooke found that 'because of the chronic nature of the illness, the medication would not change his status and he would continue to remain incompetent' even if medicated." Appellee's Brief at 10 (quoting N.T., 6/17/04, at 5). Dr. Cooke, however, did not testify

before the PCRA court. Although the court did admit Dr. Cooke's expert report into evidence, that is not the source of the conclusion that appellee's counsel attributes to Dr. Cooke. Instead, appellee's counsel here quotes his own characterization to the PCRA court as to the conclusion allegedly reached by Dr. Cooke. An advocate's characterization is not sufficient "evidence" to support a court's findings of fact.

Appellee's counsel's characterization of Dr. Sadoff's testimony is equally questionable. More importantly, it is impossible to rectify the PCRA court's finding that medication "could not and would not" render appellee competent—a finding for which it cited no evidence—with Dr. Sadoff's actual testimony that, "if he gets the right medication and the proper dosage and is monitored carefully over a period of time and shows improvement, then I would say yes, then it works."

In the psychiatric realm, of course, there is often little certainty. Defense counsel's claim respecting the "speculation" required is an ineluctable part of the equation. Here, however, when asked to predict the likely effect of medication, the expert evidence from the Commonwealth and the defense was consistent. That evidence showed that antipsychotic medication would be substantially likely to render appellee competent and substantially unlikely to have side effects that would interfere significantly with his ability to assist PCRA counsel should he choose to pursue PCRA relief.

Consistently with *Sell*, we next consider whether the involuntary administration of antipsychotic drugs is necessary to achieve the dual interests we have identified. This factor requires the Commonwealth to show that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174.

The Commonwealth notes that Dr. O'Brien testified that there were, in fact, no less intrusive means of restoring appellee's competence than the administration of antipsychotic medication. The Commonwealth further contends that Dr. Sadoff did not dispute Dr. O'Brien's opinion. Counsel for appellee denies that the administration of antipsychotic drugs

is necessary to achieve the Commonwealth's finality interest. Appellee's counsel asserts that the Commonwealth's interest in finality is furthered by allowing the litigation to proceed with a next friend.

We have already noted and explained why the fact that a next friend has been appointed does not eliminate society's finality concern. *See supra* at 557 (noting that appellee's counsel has already sought assurances from PCRA court that, should appellee regain competence in future, counsel would be permitted to litigate any additional claims that were subsequently identified); *Haag,* 809 A.2d at 280 n. 11 (opining, in *dicta,* that "Haag would have the opportunity to seek review of claims otherwise unavailable under the PCRA, but unraisable in his first petition due to his incompetence"). Moreover, as we noted in *Sam:*

> [t]he "interest" here ... is not simply the strong societal interest in finality. Rather, the instant case clearly implicates the *Sell* caveat, *see Sell,* 539 U.S. at 181–82, 123 S.Ct. 2174 (recognizing possible existence of "different purposes" for compelled medication such as "purposes related to the individual's own interests"). Medicating appellee so that he can decide whether to pursue PCRA relief, and then assist in its pursuit if he desires collateral review, is in **appellee's** interest.

*Sam,* 952 A.2d at 579. Regarding this autonomy interest, the record does not support the notion that allowing the present litigation to proceed with Mrs. Watson serving as next friend would be adequate. According to her testimony, Mrs. Watson's conclusion that her pursuit of PCRA relief for appellee was in appellee's interest was based on her conversations with appellee's counsel and death penalty shadow counsel, none of whom appears to be receiving any cooperation or encouragement from appellee whatsoever. *See* N.T., 10/18/04, at 43–44 (responding affirmatively to the question, "And based on [the] conversations [with counsel], you understand it's in the interest of your son to live and not to be put to death[?]"). For his part, appellee expressed to the PCRA court his own desire that his death sentence be executed.

While appellee is not currently competent to rationally choose whether to pursue PCRA relief, Dr. O'Brien testified that medication would restore appellee's competence, and Dr. Sadoff did not disagree. As the Commonwealth notes, Dr. O'Brien expressly confirmed that there were no less intrusive means of restoring appellee's competence other than the administration of antipsychotic medication. In rendering this opinion, Dr. O'Brien noted that, during the years when appellee was under the supervision of clinicians, appellee's symptoms were "under control" only during the periods of time when he was taking the medication. Dr. O'Brien's testimony in this regard is undisputed. Therefore, the record made by the Commonwealth *sub judice* compels the finding that the administration of antipsychotic medication is necessary to further the societal interest in finality as well as appellee's interest in determining whether to exercise his right to collateral review.

Finally, guided by *Sell*, we ask whether the administration of antipsychotic drugs is medically appropriate. Within the meaning of *Sell*, a treatment is medically appropriate if it is "in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174. Naturally, when considering the medical appropriateness of a given treatment, a certain degree of "deference [ ] is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates ... and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case." *Washington v. Harper*, 494 U.S. 210, 230 n. 12, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

With respect to this last prong of the *Sell* test, the Commonwealth notes that Dr. O'Brien testified that it would indeed be medically appropriate to treat appellee with antipsychotic medication. The Commonwealth also cites prison records admitted by the PCRA court indicating that physicians there had repeatedly prescribed such medication for appellee. Dr. Sadoff, the Commonwealth notes, did not provide a contrary opinion.

In response, appellee's counsel asserts that "Dr. Sadoff's unrebutted testimony[ ][ ] was that **forced** drugging would have to be achieved through **injection** of drugs like Haldol and Prolixin, which **do** have the serious, life-threatening side-effects that the Commonwealth claims are absent from some drugs." Appellee's Brief at 35. Therefore, counsel for appellee argues, the Commonwealth has failed to show that the involuntary administration of antipsychotic medication is medically appropriate in the instant case.

This characterization of Dr. Sadoff's testimony again is inaccurate. Dr. Sadoff did not testify that appellee would have to be injected with medications with "life-threatening" side effects. Rather, Dr. Sadoff testified that he would prescribe Haldol or Prolixin (the injectable medications with more serious side effects) only if appellee refused to take Zyprexa (one of two oral medications with less serious side effects that appellee had voluntarily taken in the past). In any event, Dr. Sadoff never characterized the side effects of Haldol and Prolixin as "life-threatening." *See* N.T., 10/18/04, at 38 (identifying side effect of Haldol and Prolixin as "the shakiness that we call dyskinesia"). More importantly, Dr. Sadoff did not testify that treating appellee with any of the above medications was medically inappropriate. Thus, Dr. O'Brien's testimony in this regard (that treating appellee with antipsychotic medication **was** medically appropriate) not only remained unrebutted—it was consistent with that of Dr. Sadoff. The record *sub judice* therefore was more than adequate to support the Commonwealth's assumed burden, under *Sell*, of showing that the administration of antipsychotic medication is medically appropriate in the case *sub judice*.

Because we find that all four factors of the *Sell* test have been satisfied, we hold that the PCRA court erred in determining that federal due process precludes the involuntary administration of medication in order to advance the PCRA process in the instant case.[13]

13. Moreover, because the Commonwealth satisfied *Sell*, we need not squarely determine whether a more relaxed standard would satisfy due

518

■ Our conclusion that compelling appellee (if necessary) to take medication to enable him to rationally determine whether to pursue PCRA relief does not offend the federal Due Process Clause, however, does not end our inquiry. Appellee's counsel contends that the decision of the PCRA court can be affirmed on alternate grounds. Namely, counsel for appellee argues, as does Sam's counsel in our companion case, that the Pennsylvania Mental Health Procedures Act ("MHPA" or "the Act") [14] requires that the Commonwealth's request to compel the administration of antipsychotic medication be denied.

Noting that Section 103 of the MHPA provides that the Act "establishes rights and procedures for all involuntary treatment of mentally ill persons," 50 P.S. § 7103, appellee's counsel contends that "unless involuntary treatment is allowed by the MHPA, it is forbidden entirely," Appellee's Brief at 22. Citing Section 301(a) of the Act, counsel argues that treatment may be compelled for an inmate who has already been tried only if the inmate "poses a clear and present danger of harm to others or to himself." *Id.* at 23.[15] Because the PCRA court

process, under the *Sell* caveat, given appellee's autonomy interest in availing himself of complete PCRA review.

14. Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. §§ 7101–7503.

15. As additional authority for his argument that the MHPA precludes compelled medication here, appellee's counsel relies upon the following sentence from our recitation of the procedural history in *Haag, supra:*

> Following a hearing on January 4, 1999, the PCRA court dismissed the [Commonwealth's] motion [that the Department of Corrections be ordered to provide treatment to Haag for paranoid schizophrenia] because the court found that the Attorney General had presented no evidence that Haag was a danger to himself or others as is required for involuntary treatment of all individuals under the Mental Health [Procedures] Act.

*Haag,* 809 A.2d at 276 (citing 50 P.S. § 7401 in a footnote). As the Commonwealth notes in response to appellee's counsel's reliance on the above quotation from *Haag,* this Court certainly did not hold—or even suggest—in that case that the MHPA requires a showing of dangerousness before an inmate can be compelled to take medication. Rather, in reciting the procedural history of that case, we merely noted, without passing upon, the PCRA court's determination that the Commonwealth's failure to make such a showing was fatal to its motion. In any event, as we have already explained, *Haag* did not involve the

found that appellee does not pose a danger to himself or others, appellee's counsel concludes, the MHPA forbids the Commonwealth from forcing appellee to take medication to restore his competence. Moreover, consistently with Sam's counsel in our companion case, appellee's counsel argues that, even if the MHPA would otherwise permit the Commonwealth to forcibly medicate appellee to achieve his competence, the particular order that the Commonwealth here seeks would be improper because Section 109(c) of the Act forbids a court from requiring "the adoption of any treatment technique, modality, or drug therapy." 50 P.S. § 7109(c).

In response, the Commonwealth notes that the text of Section 301 of the MHPA, which sets forth the standard for civil commitments, does not itself specify that dangerousness is the only circumstance in which medication may be compelled. Echoing its argument in *Sam,* the Commonwealth notes that this Court has declined to extend the provisions of the Act beyond their express terms, citing *In re Heidnik,* 554 Pa. 177, 720 A.2d 1016 (1998) and *Commonwealth v. Jermyn,* 539 Pa. 371, 652 A.2d 821 (1995). The Commonwealth further observes that nothing in the MHPA prohibits the involuntary administration of medication to render an inmate competent in the post-conviction context.

In rejecting Sam's counsel's reliance upon the MHPA in our companion case, we noted as follows:

> We considered the applicability of the MHPA in the post-conviction context in *Commonwealth v. Jermyn,* which concerned a death row inmate's competence to be executed. Jermyn claimed that the lower court erred in applying the competence standard set forth in *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), *i.e.,* whether the inmate understands the reasons for the death penalty and its implications. Instead, Jermyn argued, the lower court should have relied upon Section 402 of the MHPA, which provides, in pertinent part, as follows:

permissibility of compelled medication to render an inmate competent to determine whether to pursue PCRA relief.

§ 7402. **Incompetence to proceed on criminal charges and lack of criminal responsibility as defense**

(a) **Definition of Incompetency.**—Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

\* \* \* \*

50 P.S. § 7402 (amended 1996). In determining that the MHPA did not apply to the proceeding, we noted in *Jermyn* that "Section 402 of the Act is plainly worded. It applies only during the trial, conviction and imposition of sentence." *Jermyn*, 652 A.2d at 823; *accord Haag*, 809 A.2d at 277 (citing *Jermyn* for proposition that Section 402(a) "does not apply beyond sentencing"). Accordingly, we held that the lower court correctly applied the *Ford v. Wainwright* standard to determine Jermyn's competence. Moreover, in light of our conclusion that the MHPA was inapplicable, we noted that it was unnecessary to consider Jermyn's claims that the lower court erred in failing to apply the hearing procedures outlined in the MHPA. *Jermyn*, 652 A.2d at 824 n. 2.

Instantly ... it makes little sense to apply a statute that provides the standard for incompetence "to proceed on criminal charges" to a case involving a convicted inmate's competence to initiate and assist his counsel in pursuing post-conviction collateral relief, particularly when the statute's very purpose is to assure the availability of adequate treatment for persons, like appellee, who are mentally ill.

*Sam*, 952 A.2d at 583–85 (footnote omitted). Accordingly, and consistently with our decision in *Sam*, we hold that the MHPA does not provide alternate grounds to affirm the decision of the PCRA court.

For the foregoing reasons, we hold that the PCRA court erred in determining that appellee, or his counsel and next friend on his behalf, may refuse the administration of antipsychotic medication under the circumstances of this case. Ac-

cordingly, we reverse the PCRA court's denial of the Commonwealth's request that appellee be compelled to take such medication. We direct the PCRA court to order that appellee be administered, involuntarily if necessary, antipsychotic medication to render him competent. If such medication renders appellee competent, the PCRA court is hereby directed to ascertain the following: **first,** whether appellee, in fact, wishes to pursue PCRA relief; and, if the answer to the first question is in the affirmative, then, **second,** whether appellee can assist counsel in pursuing such relief. If antipsychotic medication does not succeed in rendering appellee competent, the PCRA court is directed to definitively determine whether Mrs. Watson is a suitable party to serve as appellee's next friend. If the PCRA court determines that Mrs. Watson should not serve as appellee's next friend, then the court should proceed to determine whether appellee's PCRA petition should be dismissed, in accordance with the procedure set forth in this Court's mandate in *Sam.*

Reversed and remanded for proceedings consistent with this Opinion.

Justices SAYLOR, EAKIN and McCAFFERY join the opinion.

Justice BAER files a dissenting opinion in which Justice TODD joins.

Justice BAER, dissent.

For the reasons developed in my dissenting opinion in the companion case of *Commonwealth v. Sam,* 597 Pa. 523, 952 A.2d 565, 2008 WL 2853095 (Pa.2008), I respectfully dissent because the alleged governmental interest in this case fails to justify the substantial violation of the inmates' liberty interest resulting from compelled psychiatric medication. The asserted governmental interest in finality through the PCRA pales in comparison to the interest in bringing alleged criminals to trial, an interest which the United States Supreme Court found to be sufficient only in rare cases in *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

Accordingly, I would affirm the trial court's denial of the Commonwealth's attempt to compel the medication of inmates against their will.

The consequence of my conclusion in this case, however, diverges from that in *Sam*. In *Sam*, I concluded that the case should be remanded for dismissal, because the defendant did not approve of the PCRA petition. In contrast, in this case, defendant Watson actually filed the PCRA petition, *pro se*. Additionally, when he was found to be incompetent to pursue the petition, the court appointed his mother as next friend. The appointment is significant because it provides a less intrusive alternative to obtain the finality inherent in collateral review. As discussed in the Majority, the United States Supreme Court in *Sell* required that prior to ordering compelled medication in violation of an individual's liberty interest,[1] "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *See Sell*, 539 U.S. at 180, 123 S.Ct. 2174.

In *Commonwealth v. Haag*, 570 Pa. 289, 809 A.2d 271 (2002), this Court was asked whether it was appropriate to order a next friend to proceed with a first PCRA petition on behalf of an incompetent capital petitioner. The next friend argued that ordering the proceedings to go forward was inappropriate, since in order to pursue PCRA relief, the petitioner must be competent. Furthermore, she contended that the lack of competency and its effect on communication with counsel may justify suspending the PCRA proceedings even after a next friend has been appointed. We concluded, "that when represented by a next friend and counsel, a prisoner's incompetence is not a bar to effective collateral review in a death penalty case." *Id.* at 278. Indeed, we based our decision in part on the importance of finality, in hopes of resolving issues while memories and evidence are still fresh.

---

1. The state must also prove a sufficient government interest to overcome the invasion of the constitutionally protected liberty interest of the inmate. As more fully developed in my dissent in *Sam,* I adamantly conclude that the government interest in finality of the PCRA is not sufficient to overcome the liberty interest in avoiding forced medication, absent more compelling facts.

"Our decision to decline to indefinitely suspend these proceedings based upon speculation that additional claims may exist, but are, as of now, undiscoverable, aligns with the General Assembly's interest in according finality to PCRA proceedings." *Id.* at 281. Accordingly, within the framework of *Sell,* our decision in *Haag* makes clear that a next friend is a less intrusive alternative to involuntary medicating a capital petitioner for purposes of pursuing collateral relief.

Although the Majority and the Commonwealth claim that forced medication will allow for finality and for Watson to obtain any benefits available through PCRA relief, I conclude that those goals can be attained through the already appointed next friend in this case. Accordingly, I conclude that the Commonwealth failed to demonstrate a necessary element of the *Sell* test, and I would affirm the denial of forced medication.

Justice TODD joins this dissenting opinion.